## A11A1131. HICKMAN v. THE STATE.
### (716 SE2d 597)

ELLINGTON, Chief Judge.

Following a bench trial, the Superior Court of Catoosa County found Michael Hickman guilty beyond a reasonable doubt of committing aggravated assault with a deadly weapon, OCGA § 16-5-21 (a) (2), and attempting to commit hijacking of a motor vehicle, OCGA §§ 16-4-1; 16-5-44.1 (b). Hickman appeals from the denial of his motion for new trial, contending that the trial court erred in denying his motion to dismiss the indictment or, in the alternative, grant a mistrial and that the evidence was insufficient to prove that he had the requisite intent to hijack a motor vehicle. Finding no error, we affirm.

---

On appeal from a criminal conviction that follows a bench trial, the defendant

> no longer enjoys a presumption of innocence, and we view the evidence in a light favorable to the trial court's finding of guilt, giving due regard to the trial court's opportunity to judge witness credibility. This Court does not weigh the evidence or determine the credibility of witnesses. Rather, we determine only if there is enough evidence from which a rational trier of fact could have found the accused guilty beyond a reasonable doubt.

(Punctuation and footnote omitted.) *Emory v. State*, 301 Ga. App. 771, 773-774 (2) (688 SE2d 682) (2009). Viewed in this light, the trial transcript shows the following relevant facts.

At approximately 8:40 p.m. on December 3, 2009, a woman finished shopping at a Kmart store in Fort Oglethorpe and pushed a shopping cart carrying her purse and her purchases to her car, which was parked near the store's garden center. As she was loading her purchases into the car's back seat, she looked up and saw a man she did not recognize walking toward her. Sensing that she was in danger, the woman looked at the man and shook her head to signify "no"; the man responded by nodding his head "yes." As the woman started yelling for help, the man grabbed her around the neck with his left arm and ordered her to get into her car. The woman (hereinafter, "the victim") refused to comply. The attacker cursed at her, told her to be quiet, and threatened to "cut her" if she did not get inside the car. When she continued to refuse, he cut her throat with a knife he was holding in his left hand. The attacker then tried to push the victim into the driver's seat of the car, but the victim's face hit the back of the driver's seat and she continued to struggle with the attacker. After the attacker cut the woman's throat a second time, the victim told the attacker that he could have her purse, which was still in the shopping cart a short distance away, but he continued to assault her and to try to force her into her car. The victim then raised her arm, pushed the "panic" button on the remote lock to her car, and intentionally slumped to the ground to make it harder for the attacker to get her into her car. The attacker kept his arm around the victim's neck while they scuffled on the ground, and he cut her throat a third time. Finally, in an effort to get the attacker to leave, the victim offered him her car keys, but he refused to take them.

At least one eyewitness to the attack ran to the victim's car while the attacker had his arm around the victim's throat and yelled at the attacker to stop and to release the victim. A store employee also saw the attack and ran into the store to alert the manager. In addition,

the victim's adult son, who was just leaving the store after shopping with his mother and his wife, heard the victim screaming, saw her being attacked, and ran to her car, where he ordered the attacker to stop and to release his mother. After the attacker told the victim's son that it was "none [of] your business," the son told the attacker that the victim was his "f—ing mom," grabbed the attacker, lifted him off the victim, and punched him in the face. The son then let go of the attacker in order to assist his mother, and the attacker briefly threatened the son with his knife before he walked away. When the victim's son realized that the attacker had cut the victim's throat, however, he started running after the attacker while calling 911 on his cell phone. The attacker ran to the side of the store and tried to hide, but then he moved after realizing that the victim's son could see him. Although the victim's son then lost sight of the attacker, he showed a responding police officer where he believed the attacker had gone.

Within minutes, officers found Hickman hiding in the bushes on the side of a nearby embankment. Hickman had blood on his left hand, but had no apparent injuries. The victim's son identified Hickman as his mother's attacker while at the scene and again at trial. The victim and one of the eyewitnesses also identified Hickman as the attacker at trial.

Although the officers did not find a weapon in the parking lot or the grassy area where Hickman had been apprehended, early the next morning investigators found a pocket knife in the grassy area. The knife had blood on it, and DNA testing by the GBI crime laboratory confirmed that the DNA of the blood matched the DNA of the victim.

1. At the beginning of the bench trial, Hickman's defense counsel told the court that, while Hickman was contesting some "crucial" issues, "[i]t is not contested that on the night in question Mr. Hickman and [the victim] had an encounter in the parking lot of the Kmart in Fort Oglethorpe. [And it] is not contested that in the course of that encounter between the two that . . . [the victim] was seriously injured." He contended, however, that there was no evidence that, at the time of this "encounter," Hickman had the requisite intent to hijack the victim's car,[1] and Hickman makes the same argument on appeal. According to Hickman, the victim's

---

[1] See OCGA § 16-5-44.1 (b) ("A person commits the offense of hijacking a motor vehicle when such person while in possession of a firearm or weapon obtains a motor vehicle from the person or presence of another by force and violence or intimidation or attempts or conspires to do so."); see also OCGA § 16-4-1 ("A person commits the offense of criminal attempt when, with intent to commit a specific crime, he performs any act which constitutes a substantial step toward the commission of that crime.").

admission that she offered her car keys to Hickman and that he refused to take them conclusively showed that he did not intend to "seize control" of her car.

> The intention with which an act is done is peculiarly for the [factfinder]. It is often difficult to prove with direct evidence an individual's intent as it existed at the time of the act for which they are being prosecuted. Therefore, it is often necessary to prove such intent through the use of circumstantial evidence. Intent, which is a mental attitude, is commonly detectible only inferentially, and the law accommodates this. A [factfinder] may infer that a person acted with criminal intent after considering the "words, conduct, demeanor, motive, and all other circumstances connected with the act for which the accused is prosecuted." OCGA § 16-2-6. In order to support a conviction, such circumstantial evidence does not have to exclude *every* possible hypothesis other than the defendant's guilt, but only *reasonable* hypotheses. Whether a hypothesis is reasonable is a question for the [factfinder], and such finding will not be disturbed on appeal unless the guilty verdict is insupportable as a matter of law.

(Citations and punctuation omitted; emphasis in original.) *Eberhart v. State*, 241 Ga. App. 164, 165 (1) (526 SE2d 361) (1999).

Given the evidence presented, especially Hickman's repeated use of a deadly weapon to attempt to force the victim to get inside the car, the trial court, as the factfinder, was authorized to conclude that Hickman rejected the car keys when the victim offered them simply because it was his intent to abscond with *both* the car *and* the victim. See *Eberhart v. State*, 241 Ga. App. at 165 (1). Accordingly, the evidence was sufficient to find Hickman guilty beyond a reasonable doubt of attempting to hijack a motor vehicle. *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SC 2781, 61 LE2d 560) (1979); *Adams v. State*, 276 Ga. App. 319, 319-321 (623 SE2d 525) (2005).

2. Hickman also argues that the trial court erred in denying his motion to dismiss the indictment or, in the alternative, grant a mistrial due to due process violations resulting from the State's destruction of "potentially crucial video evidence of the incident." The video evidence to which Hickman refers was a recording made by one of Kmart's surveillance cameras on the night at issue.[2] Hickman argues that, if the State had instructed the store's manager

---

[2] The trial transcript shows that the victim and the store employee testified that it was fairly dark at the time of the attack (8:40 p.m. in December), and that the lighting in Kmart's

to preserve or copy the recording, "the entire incident could have been viewed by the trial court to determine [his] culpability or lack thereof."

In his appellate brief, however, Hickman concedes that recent Georgia precedent on the preservation of surveillance recordings is adverse to his arguments.[3] Moreover, there is nothing in the record in this case that even suggests that the recording would have demonstrated Hickman's lack of culpability for the crimes or would have otherwise had any apparent exculpatory value or that the State acted in bad faith in failing to preserve the recordings. See *State v. Brawner*, 297 Ga. App. 817, 818-819 (678 SE2d 503) (2009) (There was no evidence "that anything on the videotape was readily seen, understood, evident, or obvious or that it had any exculpatory value," and, in fact, the evidence showed the contrary: "the images were distorted, small, and distant." Further, police officers testified that they were unable to identify either the victim or the defendant from the tape. Under such circumstances, there was no evidence to support a finding that the videotape had any "apparent exculpatory value" before it was lost.) (punctuation and footnotes omitted). As shown above, not only was there overwhelming evidence in this case to show that Hickman committed the crimes for which he was convicted, but Hickman's counsel *specifically conceded* at the beginning of the bench trial that Hickman was the attacker in this case and that, as a result of the attack, the victim was seriously injured. Consequently, Hickman has failed to demonstrate that the trial court

---

parking lot was very poor. It also shows that, shortly after the attack, police investigators met with Kmart's manager and looked at the recording made by a surveillance camera that was pointed toward the general area where the victim's car had been parked. According to the investigators, the black and white recording was out of focus and was completely dark except for the areas around some of the parking lot's lights. The investigators testified that the recording was so dark that it did not show any people or cars in the parking lot. Consequently, the investigators did not ask the manager to retain the original or make a copy of it. Neither the State nor Hickman called Kmart's manager as a witness at trial to testify regarding what he saw on the recording.

[3] See, e.g., *State v. Brawner*, 297 Ga. App. 817, 818-819 (678 SE2d 503) (2009) ("In dealing with the failure of the state to preserve evidence which might have exonerated the defendant, a court must determine both whether the evidence was material and whether the police acted in bad faith in failing to preserve the evidence. To be material, the evidence must have had an apparent exculpatory value before it was lost, and be of such a nature that the defendant cannot obtain comparable evidence by other reasonable means." Further, "[t]he word 'apparent' means 'readily seen; visible; readily understood or perceived; evident; obvious.' ") (punctuation and footnotes omitted); see also *State v. McNeil*, 308 Ga. App. 633, 637-638 (708 SE2d 590) (2011) (In order to rise to the level of constitutional materiality, "the exculpatory value of the evidence must be apparent *before* its loss or destruction, and the evidence must be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Further, "the fact that evidence may be *potentially* useful in a defendant's attempt at exoneration is insufficient to sustain a claim that the defendant has suffered an abridgment of due process of law due to the destruction or loss of the evidence.") (punctuation and footnote omitted; emphasis in original).

erred in denying his motion to dismiss the indictment or grant a mistrial based upon the State's failure to preserve the surveillance camera recording. *State v. McNeil*, 308 Ga. App. 633, 637-639 (708 SE2d 590) (2011); *State v. Brawner*, 297 Ga. App. at 818-819.

*Judgment affirmed. Miller, P. J., and Doyle, J., concur.*

DECIDED AUGUST 30, 2011.

*David J. Dunn, Jr.*, for appellant.
*Herbert E. Franklin, Jr., District Attorney*, for appellee.